COPY

1   BLECHER & COLLINS, P.C.
    Maxwell M. Blecher (State Bar No. 26202)
2     mblecher@blechercollins.com
    Maryann R. Marzano (State Bar No. 96867)
3     mmarzano@blechercollins.com
    Kristen M. Peters (State Bar No. 252296)
4     kpeters@blechercollins.com
    515 South Figueroa Street, Suite 1750
5   Los Angeles, California 90071-3334
    Telephone: (213) 622-4222
6   Facsimile: (213) 622-1656

7   Attorneys for Plaintiff VELTEX CORPORATION

8              UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10                    WESTERN DIVISION

11

12  VELTEX CORPORATION, a Utah        )   CASE NO. CV10 1746 ABC (PJWx)
    corporation,                      )
13                                    )   FIRST AMENDED COMPLAINT
                  Plaintiff,          )   FOR DAMAGES AND EQUITABLE
14                                    )   RELIEF FOR:
          vs.                         )
15                                    )   (1)  SECURITIES FRAUD;
    JAVEED AZZIZ MATIN, an individual; )
16  TANZILA SULTANA, an individual;    )   (2)  FRAUDULENT TRANSFER
    SAASHA CAMPBELL, an individual;    )        AND CONVEYANCE;
17  MAZHAR HAQUE, an individual;       )
    ALLEN E. BENDER, an individual;    )   (3)  CONSPIRACY TO BREACH
18  VELTEX USA, INC., a Delaware       )        AND BREACH  OF
    corporation; VELTEX APPAREL, INC., )        FIDUCIARY DUTY;
19  a California corporation; VELTEX   )
    INDUSTRIES, INC., a Delaware       )   (4)  PROFESSIONAL
20  corporation; VELTEX EXPLORER,      )        NEGLIGENCE–ATTORNEY
    INC., a Canadian corporation; VELTEX )      MALPRACTICE;
21  CANADA, INC., a Canadian           )
    corporation; WILSHIRE EQUITY, INC. )   (5)  BREACH OF FIDUCIARY
22  aka WILSHIRE EQUITIES, INC., a     )        DUTY–ATTORNEYS;
    Colorado corporation; AMERICAN     )
23  REGISTRAR & TRANSFER CO., a        )   (6)  PROFESSIONAL
    Utah corporation; PATRICK R. DAY, an )      NEGLIGENCE–ACCOUNTANT
24  individual; RICHARD M. DAY, an     )        MALPRACTICE; and
    individual; MOORE & ASSOCIATES,    )
25  CHARTERED, a Nevada corporation;   )   (7)  BREACH OF FIDUCIARY
    MICHAEL J. MOORE, an individual;   )        DUTY– ACCOUNTANTS
26  CHISHOLM, BIERWOLF, NILSON &       )
    MORRILL, CPA, aka CHISHOLM,        )   [DEMAND FOR JURY TRIAL]
27  BIERWOLF & NILSON, LLC, a Utah     )
    limited liability company; BRAD B. )   Complaint filed: March 10, 2010
28  HAYNES, an individual; ANNE        )

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

First Amended Complaint

1  TAHIM, an individual; JAAK U.                )
   OLESK, an individual; and CARMINE            )
2  J. BUA, an individual,                       )
                                                )
3                       Defendants.             )

4

5

6       Plaintiff VELTEX CORPORATION ("Veltex," "Plaintiff" or "Plaintiff

7  Veltex") hereby complains and alleges as follows:

8                                    **I.**

9                    **SUMMARY OF THE ACTION**

10      1.  This case involves a classic "pump and dump" securities claim conceived

11 and engaged in by, and for the primary benefit of, Defendants JAVEED AZZIZ

12 MATIN, SAASHA CAMPBELL, MAZHAR HAQUE, TANZILA SULTANA,

13 ALLEN E. BENDER and PATRICK R. DAY (sometimes collectively referred to

14 herein as the "Management Defendants"), with the active and conscious support

15 and participation by each of the other named individual and entity Defendants

16 herein.  Under the scheme, the Management Defendants pumped up the value of

17 the stock in Veltex, a publicly traded company, with false and misleading data

18 causing the price of the shares to rise. Then, the insiders (those doing the

19 "pumping") sold the inflated Veltex shares into the market (the "dumping") to

20 unsuspecting investors who became, along with the corporation itself, victims of

21 the scheme.  This unlawful scheme required planning and numerous participants,

22 including lawyers, accountants and transfer agents, who are named as party-

23 Defendants herein.

24      2.  The Management Defendants, because of their positions of authority as

25 Officers and/or Directors of Veltex, were able to, and did, control the content of

26 press releases and other public statements pertaining to Veltex during the relevant

27 time periods.  Each of the Management Defendants participated in the preparation

28 of and/or were provided copies of the documents alleged herein to be misleading

                                    - 1 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1    prior to or shortly after their issuance and/or had the ability and/or opportunity to

2    prevent their issuance or cause them to be corrected.  By reason of their stock

3    ownership, positions and relations to Veltex, the Management Defendants were

4    controlling persons of Veltex and are liable under Section 20(a) of the Securities

5    and Exchange Act of 1934. Veltex' press releases, reports and communications to

6    shareholders were false and misleading.  As Officers, Directors and/or controlling

7    persons of Veltex, a publicly held company, the Management Defendants had a

8    duty to disseminate promptly, truthfully and accurately information with respect to

9    the corporation's operations, business, products, markets, management, earnings,

10   and present and future business prospects, and to cause Veltex' financial

11   statements to present fairly and accurately its financial condition and results from

12   operations in conformity with generally accepted accounting principles ("GAAP").

13   The Management Defendants were also required to correct any previously issued

14   statements that had become untrue and to disclose any adverse trends that would

15   materially affect the present and future financial operating results of the

16   corporation, so that the market prices of Veltex' stock would be based upon

17   truthful and accurate information.

18       3. The Management Defendants owed fiduciary duties to Veltex such that

19   they were precluded from acting in their own self-interest and to the detriment of

20   Veltex. Their conduct directly caused and/or contributed to the artificial inflation

21   of the value of Veltex' shares. Further, the Management Defendants created a

22   massive web of interrelated corporate entities, some of which bore similar names

23   to "Veltex" which aided in the fraudulent and illegal actions they undertook,

24   and/or utilized corporate counsel and outside securities lawyers, accountants, and

25   transfer agents, who are named as Defendants herein, as part of their scheme to

26   perpetrate securities fraud and fraudulently transfer monies and assets of Veltex all

27   for their own personal benefit and in derogation of the corporate entity, Veltex.

28   These entities included Defendants VELTEX USA, INC., VELTEX APPAREL,

- 2 -

INC., VELTEX INDUSTRIES, INC., VELTEX EXPLORER, INC. and VELTEX CANADA, INC.

## II.

## THE PARTIES

4. Plaintiff Veltex is a corporation organized and existing under the laws of the State of Utah with its principal place of business in Chicago, Illinois. Veltex' stock is publicly traded on the "Pink Sheets," an over-the-counter market, under the symbol VLXC. Veltex is a nonreporting SEC company which was reorganized on or about August 2009, following dissident shareholder litigation being instituted in the State of Utah, seeking the ouster of Defendants JAVEED AZZIZ MATIN, SAASHA CAMPBELL and MAZHAR HAQUE from Veltex' management. Veltex was previously headquartered in the City of Industry, California, where it leased office space and a warehouse. It had engaged in the sale of wearing apparel in the United States and Canada. Its products had included t-shirts, jackets, sweaters, sweatshirts, and baseball caps.

5. Defendant JAVEED AZZIZ MATIN ("Matin") is an individual and citizen of the State of California, with his primary residence in Diamond Bar, California. Matin was the founder, largest shareholder, and until recently removed from that position, the Chief Executive Officer ("CEO") and Chairman of the Board of Veltex. During all relevant times covered by this Complaint, Matin controlled and directed Veltex' business and operations. Until he was ordered to pledge and transfer three million (3,000,000) shares of Veltex common stock that he owned to Wayne H. Hanson, by U.S. District Court Judge Florence-Marie Cooper in the action entitled "*Wayne H. Hanson vs. Veltex Corporation, etc., et al.,*" Case No.: CV08-02149 FMC (MANx) (the "Hanson action"), Matin was the largest single shareholder in Veltex.

6. Defendant TANZILA SULTANA ("Sultana") is the wife of Matin. She is an individual and citizen of the State of California, with her primary residence,

- 3 -

together with her husband, in Diamond Bar, California.  During all relevant times covered by this Complaint, Sultana was intimately involved in the business and operations of Veltex, and a shareholder in Veltex.  The home in Diamond Bar, California in which Main and Sultana reside, was purchased, in part, with proceeds from the sale of artificially inflated Veltex shares by Sultana.

7.  Defendant SAASHA CAMPBELL ("Campbell") is an individual and citizen of the State of California, with her primary residence within the Central District of California.  Campbell was at all relevant times covered by this Complaint, the mistress of Matin; a member of the Veltex Board of Directors; and the Secretary-Treasurer of Veltex.

8.  Defendant MAZHAR HAQUE ("Haque") is an individual and citizen of the State of California, with his primary residence within the Central District of California.  Haque was at all relevant times covered by this Complaint, the Chief Financial Officer ("CFO") of Veltex, and a member of the Veltex Board of Directors since at least 2007.

9.  Defendant ALLEN E. BENDER ("Bender") is an individual and citizen of the State of Maryland.  Bender was at all relevant times covered by this Complaint, a member of the Veltex Board of Directors, and a shareholder in Veltex.  He became a member of the Veltex Board on February 29, 2008 and resigned from the Board on May 11, 2008.

10.  Defendant VELTEX USA, INC. ("Veltex USA") is a Delaware corporation.  Matin is also the President and sole shareholder of Veltex USA, owning one hundred percent (100%) of its stock.

11.  Defendant VELTEX APPAREL, INC. ("Veltex Apparel") is a California corporation.  Matin is also the President and sole shareholder of Veltex USA, owning one hundred per cent (100%) of its stock.  Campbell is also the Secretary thereof.

12.  Defendant VELTEX INDUSTRIES, INC. ("Veltex Industries") is a

- 4 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1   Delaware corporation. Matin is also the President and sole shareholder of Veltex
2   Industries, owning one hundred per cent (100%) of its stock.

3        13. Defendant VELTEX EXPLORER, INC. ("Veltex Explorer") is a
4   Canadian corporation, incorporated and doing business in Ontario, Canada.
5   Defendant VELTEX CANADA, INC. owns one hundred per cent (100%) of its
6   stock. Matin is also the President and sole shareholder of Veltex Explorer.

7        14. Defendant VELTEX CANADA, INC. ("Veltex Canada") is a Canadian
8   corporation, incorporated and doing business in Ontario, Canada. Matin is also
9   the President and sole shareholder of Veltex Canada, owning one hundred per cent
10  (100%) of its stock.

11       15. Defendant WILSHIRE EQUITY, INC. *aka* WILSHIRE EQUITIES,
12  INC. ("Wilshire Equity") is a Colorado corporation. Matin is also the President
13  and sole shareholder of Wilshire Equity, owning one hundred per cent (100%) of
14  its stock. Haque is also the Secretary and Treasurer of Wilshire Equity.

15       16. Defendant AMERICAN REGISTRAR & TRANSFER CO. ("ARTCO")
16  is corporation organized and existing under the laws of the State of Utah with its
17  principal place of business in Salt Lake City, Utah. ARTCO is a corporate transfer
18  agent engaged in facilitating the registry and transfer of corporate shares. During
19  the relevant times covered by this Complaint, ARTCO was the transfer agent for
20  Veltex, until its services were terminated in or about the Summer of 2008, after
21  legal proceedings were instituted in the State of Utah and in federal court in the
22  Central District of California.

23       17. Defendant PATRICK R. DAY ("Patrick Day") is an individual and
24  citizen of the State of Utah, with his primary residence in Utah. He was the
25  President of ARTCO in 2008, and served in that capacity for a period of time prior
26  thereto post-2006. He was also a member of the Veltex Board of Directors since
27  at least 2006, until his resignation on August 27, 2007.

28       18. Defendant RICHARD M. DAY ("Richard Day") is an individual and

citizen of the State of Utah, with his primary residence in Utah.  He is the father of Patrick Day.  In 2006, and for a period of time prior thereto, Richard Day held a variety of management positions with ARTCO, including President, Vice-President and Director positions, along with other members of the Day family.  Richard Day was the majority owner of ARTCO at all relevant times covered by this Complaint.  In addition, Richard Day is an attorney licensed to practice law in the State of Utah, with offices located in Sandy, Utah.  In 2006, he provided legal services to Veltex and acted as an outside securities attorney for Veltex.

19.  Defendant MICHAEL J. MOORE is an individual and citizen of the State of Nevada, with his primary residence in Las Vegas, Nevada.  Moore was at all relevant times covered by this Complaint, a certified public accountant ("CPA") licensed by the States of Nevada and Texas.  Moore is the President and majority owner of Defendant MOORE & ASSOCIATES CHARTERED.  Moore was the only CPA of Defendant MOORE & ASSOCIATES CHARTERED from its inception through late 2008 and the auditor with final responsibility for all audits performed by that firm during such time.

20.  Defendant MOORE & ASSOCIATES CHARTERED ("Moore & Associates") is a Nevada corporation and public accounting firm headquartered in Las Vegas, Nevada.  Moore & Associates is registered with the Public Company Accounting Oversight Board ("PCAOB") to prepare and issue audit reports on the financial statements of public reporting companies.  During the relevant times covered by the Complaint, Moore & Associates performed accounting work and services for Veltex; purportedly conducted an audit of Veltex' books and records; and prepared audited financial statements for Veltex, and other "Veltex" named entities.

21.  Defendant CHISHOLM, BIERWOLF, NILSON & MORRILL, CPA *aka* CHISHOLM, BIERWOLF & NILSON, LLC ("CBNM") is a Utah limited liability company and certified public accounting firm with offices in Bountiful,

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1  Utah.  CBNM performed accounting work and consulting services for Veltex since

2  at least 2004.

3    22.  Defendant BRAD B. HAYNES ("Haynes") is an individual and citizen

4  of the State of California, with his primary residence within the Central District of

5  California.  Haynes was at all relevant times covered by this Complaint, a CPA

6  licensed by the State of California, and doing business in the County of Los

7  Angeles. Haynes performed accounting services for Veltex since at least 2005.

8    23.  Defendant ANNE TAHIM ("Tahim") is an individual and citizen of the

9  State of California, with her primary residence in the County of Orange.  Tahim

10  was at all relevant times covered by this Complaint, a CPA licensed by the State of

11  California, and doing business in the Counties of Los Angeles and Orange, with

12  offices in the County of Orange.  Tahim performed accounting work for Veltex

13  since at least 2001.

14    24.  Defendant JAAK U. OLESK ("Olesk") is an individual and citizen of

15  the State of California, with his primary residence in the County of Los Angeles.

16  He is an attorney licensed to practice law in the State of California with offices in

17  Beverly Hills, California.  Olesk is also a CPA, licensed by the State of California.

18  Plaintiff is informed and believes, and thereon alleges, that Olesk's California

19  CPA license is currently delinquent.  During the relevant times covered by this

20  Complaint, Olesk served as corporate counsel for Veltex, and in that capacity,

21  performed legal services for Veltex, Matin and other of Veltex' Officers, Directors

22  and personnel.  Those services, as summarized in the written contract by Veltex to

23  employ Olesk, included the drafting, negotiation and review of contracts; advising

24  Matin and other of Veltex' officers and personnel "regarding conforming their

25  conduct to act within the law"; and reviewing, recommending changes to and

26  approving all Veltex press releases prior to issuance.  A true and correct copy of

27  that letter agreement dated June 27, 2005 (together with a copy of the

28  corresponding invoice and checks for initial payment, as found in Veltex' files), is

- 7 -

1  attached hereto as Exhibit 1.

2      25.  Defendant CARMINE J. BUA ("Bua") is an individual and citizen of

3  the State of California, with his primary residence, upon information and belief, in

4  the County of San Diego.  He is an attorney licensed to practice law in the State of

5  California with offices in San Diego, California.  Bua has been an inactive

6  member of the State Bar of California since April 10, 2010.  During the relevant

7  times covered by this Complaint, Bua served as the outside "securities attorney"

8  for Veltex and, beginning in at least October 2005, also served as "General

9  Counsel" for Veltex.  In that capacity, he performed legal services for Veltex

10  which included issuing legal opinion letters stating that offerings were in

11  compliance with a private placement exemption under Regulation D, Rule 504 of

12  the Securities Act of 1933 (sometimes referred to herein as "the 1933 Act") among

13  other regulations and authorized the transfer agent to issue shares in Veltex

14  common stock without a restrictive legend, facilitating their free transferability, to

15  affiliated entities such as Wilshire Equity, Inc., an entity owned and controlled by

16  Matin.

**III.**

**JURISDICTION AND VENUE**

19      26.  Plaintiff's claims arise under and pursuant to the Securities and

20  Exchange Act of 1934 (sometimes referred to herein as "the 1934 Act"), Sections

21  10(b) and 20(a), 15 U.S.C. §§ 78j(b), 78t(a), and rule 10b-5, 17 C.F.R. § 240.10b-

22  5 promulgated thereunder by the Securities and Exchange Commission ("SEC").

23      27.  This Court also has jurisdiction under 28 U.S.C. § 1331, 15 U.S.C. §

24  77v and 15 U.S.C. 78aa, on the basis that Plaintiff alleges violations of the

25  anti–fraud provisions of the Securities Act of 1933.  Therefore, the United States

26  District Court has exclusive jurisdiction pursuant to Section 27 of the 1934 Act, 15

27  U.S.C. § 78aa, and 28 U.S.C. § 1331 under federal question jurisdiction.  This

28  Court also has supplemental jurisdiction over the state law claims in that the state

- 8 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1    law claims arise from the same nucleus of facts as the federal question claim.

2          28.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), 15

3    U.S.C. § 77v and 15 U.S.C. § 78aa, on the basis that the Defendants are residents,

4    inhabitants and/or are doing business in this District.  Venue is also proper in this

5    District pursuant to 28 U.S.C. § 1391(b)(2) because during the relevant times

6    covered by the Complaint, Veltex maintained its principal place of business in this

7    District, currently transacts business in this District, and most of the Defendants'

8    actions and practices, and the events, omissions and transactions giving rise to the

9    claims in this action occurred in whole or substantial part in this District.

10         29.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b), in

11   that the claims arose in Los Angeles, California, located in the Central District of

12   California.

**IV.**

**FACTS COMMON TO ALL CLAIMS**

13

14

15         A.   **The Management Defendants' Wrongful Activities**

16         30.  Since at least 2004, and until he was removed pursuant to Court Order

17   issued by the Honorable Kate A. Toomey on July 21, 2008, pursuant to an action

18   initiated by dissident Veltex shareholders in Utah State Court in the action

19   entitled: " *Robert Fletcher, et al. v. Veltex corporation, et al.,* " Civil Action No.

20   080907145 (the "Utah action"), Matin functioned as the Chairman of Veltex'

21   Board of Directors and its CEO without any oversight by the Veltex shareholders

22   or an independent Board of Directors. Campbell, Haque, Day and Bender have

23   been subject to Matin's control and have not functioned as independent Directors.

24   Campbell and Haque were also removed from their positions as Directors and

25   Officers of Veltex on July 21, 2008, pursuant to the Order issued by Judge

26   Toomey on July 21, 2008.

27         31.  The Management Defendants have engaged in a series of wrongful

28   activities, including but not limited to, the issuance of false statements as to the

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

- 9 -

1   revenues and profits of Veltex, the issuance of false statements as to the number of

2   outstanding shares of Veltex stock, the misrepresentation of the existence of

3   Veltex' purported manufacturing facilities, the misrepresentation of the sale of

4   Veltex' purported manufacturing facilities, and the diversion of Veltex' revenue

5   and assets, the dissipation of Veltex' assets.  This was all done in furtherance of

6   the "pump and dump" scheme masterminded by Matin, and carried out with the

7   intent, knowledge and assistance of the other Management Defendants; the

8   Attorney Defendants; the Accountant Defendants; the stock transfer agents for

9   Veltex, ARTCO; and Matin's web of corporate entity Defendants.

10   **B.   Misrepresentation of Veltex Revenues and Profits**

11   32.  During the relevant times covered by this Complaint, Matin and the

12   other Management Defendants caused a series of false representations of Veltex'

13   revenues and profits to be disseminated to Veltex' shareholders and the general

14   investing public.  These representations have included the following press releases

15   and announcements which were disseminated by means and instrumentalities of

16   interstate commerce, including the posting on Veltex' website:

17   (a) A public announcement on May 16, 2005, of Veltex' purported

18   revenues and profits for the first quarter of 2005. The revenue of Veltex'

19   consolidated operations was for the three months ending March 31 ,2005, was

20   reported as $13,270,345 and the net profits for the period was reported as

21   $1,739,537 or 22 cents per share.  The first quarter revenue was purported to

22   represent a 30% increase over the comparable period in 2004.  A true and correct

23   copy of this announcement, which was linked to Veltex' website, is attached

24   hereto as Exhibit 2.

25   (b) A public announcement on September 29, 2005, of Veltex'

26   purported revenues and profits for the six months ending June 30, 2005.  This

27   announcement stated that "sales were $18,161,000 and pre-tax income was

28   $1,356,000."  It also claimed, "The June 30, 2005 unaudited Consolidated Balance

- 10 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1   Sheet reflected total assets of $41,818,000; total current assets of $18,619,000

2   (verse total current liabilities of only $3,871,000); as well as total shareholder

3   equity of $28,935,000 (Ie. net worth)."  A true and correct copy of this

4   announcement, which was linked to Veltex' website, is attached hereto as Exhibit

5   3.

6          (c) A public announcement on October 11, 2005, of Veltex' revenues

7   and profits for the third quarter of 2005.  This announcement reported revenue of

8   "$16,740,888 for the third quarter and net pre tax income of $3,318,177."  It also

9   reported:

10         First half revenue is restated at $25,956,800 and included $7,795,800 from

11         Velvet Textile Mills that was omitted from previous press release solely

12         based on the fact that those figures had not yet been finalized at the time of

13         publication.  Net income from the Mill for the same period was $1,637,118.

14         Revenue for the first three quarters of 2005 is $42,697,688 and income of

15         $6,311 ,295.

16   A true and correct copy of this announcement, which was linked to Veltex'

17   website, is attached hereto as Exhibit 4.

18         (d) A public announcement on June 16, 2006, of Veltex' financial

19   results for the first quarter of 2006.  Veltex' gross revenue was reported as

20   $14,620,319 and its gross profit was represented to be $2,920,828.  A true and

21   correct copy of this announcement, which was linked to Veltex' website, is

22   attached hereto as Exhibit 5.

23         (e) A public announcement on December 12, 2006 of Veltex'

24   revenues and profits.  It stated that revenues for the third quarter of 2006 were

25   $19,211,913 and claimed, "Revenues have topped $19 Million for the second

26   consecutive quarter."  It was also reported: "Revenues for the nine months ended

27   September 30, 2006, totaled $53,155,810.  Gross profit for the nine months ending

28   September 30, 2006, were $15,689,013 with net income totaling $5,781,594."  A

- 11 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

true and correct copy of this announcement, which was linked to Veltex' website, is attached hereto as Exhibit 6.

(f) A public announcement on February 7, 2007, of Veltex' purported revenues and profits for 2006. Specifically, Veltex claimed to have revenues for the twelve months ending December 31, 2006, of $70,131,941 and to have ended that period with a net income of $5,545,246. It also claimed to had earnings for the year of twenty five cents ($0.25) a share and to have over $53,468,837 in assets. A true and correct copy of this announcement, which was linked to Veltex' website, is attached hereto as Exhibit 7.

(g) An announcement of Veltex' sales and profits for the first quarter of 2007 on August 27, 2007. It stated that Veltex' "sales for the first quarter of 2007 were $18,251,239 as compared to $14,620,491 for the first quarter of 2006 for an increase of $3,630,920 or almost 25%." It further reported that, "Net profit was $1,930,551." A true and correct copy of this announcement, which was linked to Veltex' website, is attached hereto as Exhibit 8.

(h) An announcement on October 18, 2007, of Veltex' financial results for the second quarter of 2007. It stated that second quarter revenue was $17,347,598 and second quarter profit was $1,908,128. It further reported that, "First half revenue was $35,598,837 as compared to $33,448,897 for the same period in 2006." A true and correct copy of this announcement, which was linked to Veltex' website, is attached as Exhibit 9.

33. The foregoing announcements and postings on Veltex' website of Veltex' revenues and profit figures were false and known to be false by Matin, the other Management Defendants and Olesk, at the time they were made. The figures announced were achieved by a subterfuge whereby paper sales were arranged between what were misrepresented to be Veltex' subsidiaries in Canada and the United States. As alleged herein, Veltex USA, Veltex Apparel, Veltex Industries and Veltex Explorer were all separate and independent corporations established

- 12 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1  by, wholly owed by and under the exclusive control of Matin. Matin utilized these

2  "Veltex" named companies as part of the scheme. For instance, goods were

3  bought by Veltex from suppliers outside North America and shipped to Veltex'

4  "Canadian subsidiary" at a mark up. The purchases were recorded in Veltex'

5  books and records as a sale for purpose of Veltex' revenue and as profit, even

6  though there was no disposition of the goods by Veltex or its "subsidiaries" and

7  the goods simply sat in Veltex' inventory. On other occasions, intra-company

8  transactions between Veltex' "Canadian subsidiary", Veltex Canada, and its

9  United States "subsidiary", Veltex Apparel, would be marked up at profit and

10 booked as sales, even though the goods remained in the subsidiary's inventory.

11 Then, the same goods might be sold back and forth on multiple occasions in paper

12 transactions without ever being shipped from the warehouses of the purported

13 Veltex "subsidiaries." Through these paper transactions back and forth between

14 the "subsidiaries", the Management Defendants were able to report substantial

15 sales and profits on consolidated financial statements, when no real revenue and

16 profit was actually generated anywhere except on paper. None of these so-called

17 "Veltex" subsidiaries were ever actually owned by or affiliated with Plaintiff

18 Veltex.

19     34. Matin and the other Management Defendants made such false

20 announcements with the intent of misleading the existing Veltex shareholders, as

21 well as members of the general investing public, in order to induce them to

22 maintain and/or purchase stock. The announcements were intended to mislead

23 existing Veltex shareholders so that Matin would remain in control of Veltex and

24 also intended to induce members of the general investing public to acquire and bid

25 for Veltex' common stock, which was then sold by Matin from Veltex authorized

26 shares for his own financial benefit.

27     **C.    Misrepresentations Regarding the Outstanding Veltex Shares**

28     35. Matin and the other Management Defendants also knowingly and

- 13 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1  intentionally made inconsistent and misleading representations as to the number of

2  outstanding shares of Veltex.  Such inconsistent and misleading statements have

3  appeared as follows:

4         (a) In the announcement which was issued on December 12, 2006, with

5  respect to Veltex' earnings through the third quarter of 2006, it was represented:

6  "With approximately 20 million shares outstanding, Veltex is pleased to report

7  earnings per share of $0.29 through the first nine months of 2006." (*See* Exhibit

8  6.)

9         (b) In announcement on September 14, 2007, it was stated that: "The

10  Company has about 18,000,000 shares outstanding with a $70,000,000 gross

11  revenue and $7 million profit."  A true and correct copy of this announcement is

12  attached hereto as Exhibit 10.

13         (c) In announcement on October 15, 2007, it was stated that: "Our

14  outstanding share figure was misstated in the last press release and should have

15  read 28,647,309."  A true and correct copy of this announcement is attached hereto

16  as Exhibit 11.

17         36.  Such inconsistent and misleading statements about the number of

18  outstanding shares were made by Matin and the other Management Defendants

19  with knowledge of their falsity or in reckless disregard of the truth, so as to

20  mislead Veltex shareholders and members of the general investing public.

21         37.  Such misstatements were material in that they induced shareholders to

22  retain Matin an the other Management Defendants in control of Veltex and

23  mislead the public to purchase Veltex common stock in the open market.

24  **D.    Misrepresentations Concerning the Ownership of**

25         **the Bangladesh Facilities**

26         38.  It was represented by Matin and the other Management Defendants that

27  Veltex owned textile manufacturing facilities in Bangladesh.  According to Matin,

28  he acquired looms from a mill in the southern United States that was about to go

- 14 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

out of business in 1996.  He then had the equipment shipped to and installed at a
mill in Camilla, Bangladesh, which became Velvet Textile Mills.  Subsequently,
Matin claimed that Velvet Textile Mills was funded through a reverse merger in
1999, and then in 2004, he acquired KCA Garment Industries in Tongi,
Bangladesh, which manufactured actual garments.  The Veltex "story" in which
this history appears was published on httpllwww.emergingissurer.com and was
linked to the Veltex website.  A true and correct copy of the article is attached
hereto as Exhibit 12.

39.  The truth is that no production facilities were actually owned by Veltex
in Bangladesh.  While Matin had acquired some textile manufacturing equipment
from a velvet mill in South Carolina and had the equipment shipped to
Bangladesh, the mill never became operational.  A third party purchased the
location for the establishment of the mill and obtained financing for the set up of
the equipment for a 50% interest in the business, but Matin spent the money for
the mill for his own personal expenses and a Bangladeshi bank holds a lien on the
unassembled equipment and other assets of Velvet Textile Mills.

40.  Further, although Matin announced that KCA Garment Industries
purportedly employed 900 workers and produced $29,000,000 of goods in 2004,
there is no record of either Veltex' or Matin's ownership of such manufacturing
entity in Tongi, Bangladesh.

**E.     The Purported Sale of the Bangladesh Facilities**

41.  On March 4, 2008, Matin issued a press release stating that Veltex was
restructuring and adopting a new business model.  Among other things, it was
represented that:

Sale of the manufacturing operations was completed as of December 31,
2007 and will be shown as a discontinued operation in the 2007 financials.
This sale will provide working capital for support and expansion of
remaining operations.  Principal terms of the sale of the remaining assets are

- 15 -

1   assumption of liabilities, Credit of $15 million to be used by Veltex as

2   partial offset against future purchases, preferred customer prices, and

3   favorable payment terms.... A gain/loss may be realized on the sale, but the

4   amount has yet to be determined by the audit.

5   A true and correct copy of this press release is attached hereto as Exhibit 13.

6      42.  Upon learning that Veltex was attempting to sell its manufacturing

7   facilities in Bangladesh, one of the Veltex shareholders, Walter Perich ("Perich"),

8   contacted Matin about submitting a bid for the facilities, but was informed on or

9   about December 5, 2007, by Veltex' corporate counsel, Defendant Olesk, that the

10  Veltex Board of Directors had already approved the sale of the factory.

11     43.  Despite repeated requests for the terms and conditions of the sale,

12  neither Matin nor Olesk would provide Perich any information until January 19,

13  2008, when they finally advised him verbally of that the sale had been

14  consummated on December 31, 2007.  Matin and Olesk advised Perich that the

15  consideration included $4,000,000 in cash in addition to $15,000,000 of product

16  over the next few years.

17     44.  Matin told Perich that Veltex had received four bids on the textile

18  factory and promised to provide Perich with copies of the bids.  Nevertheless,

19  Matin never provided Perich the purported bids.

20     45.  In a telephone conversation in February 2008, Matin confirmed again to

21  Perich that Veltex had received $4,000,000 in cash from the sale of the

22  manufacturing facilities in Bangladesh.  When the March 4, 2008 press release

23  failed to disclose the receipt of the $4,000,000 in cash from the sale, Perich

24  confronted Matin with this fact in an e-mail asking Matin if he had "lied" about

25  the payment.  In response, Matin wrote back that he had not lied, but did not

26  mention the cash payment because an audit was being conducted at Veltex.

27  True and complete copies of the e-mail exchanged between Perich and Matin on

28  March 4, 2008, are attached hereto collectively as Exhibit 14.

- 16 -

46.  Despite the representations made by Matin and Olesk about the receipt of the $4,000,000 in cash, there is no record of the purported cash proceeds from the sale of the Bangladesh facilities *ever* making it to the United States; no record of the transaction on Veltex' books and records; and no record of the payment *ever* being deposited into Veltex' corporate bank account.

47.  The purported sale of the Bangladesh manufacturing facilities was a sham, and used to cover up the fact that Veltex did not own such facilities and cover up the falsity of the representations and reports by Matin and the other Management Defendants of the revenues and profits derived from the purported facilities.  The controlling interest in Velvet Textile Mills, the entity which was established when the looms were purchased and transported to Bangladesh and which Veltex purportedly owned, was actually owned by someone else.  The unassembled equipment and property of the corporation was also encumbered by bank loans.  Thus, Veltex lacked any authority or ability to sell Velvet Textile Mills.

## F.    The Purported Veltex Corporate Audits

48.  Commencing in at least 2004, and continuing through all relevant times in the Complaint, Matin repeatedly represented to shareholders that Veltex was having audits performed of its financial affairs.  These representations have included the following press releases and announcements which were disseminated by means and instrumentalities of interstate commerce, including posting on Veltex' website:

(a) A press release on January 14, 2004, announcing that Veltex had "released its audited financial statements showing the company had Net Income of $1,653,494 on Revenues totaling $13,902,120 for Fiscal Year 2002 representing an increase of 26% over FY 2001 Net Income and 60% over FY 2001 Revenues. Audited Net Income for FY 2001 was $1,313,839 on Revenues of $8,741,348." The press release stated that the Audit Report was available on the company

- 17 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1  website and that the company "plans to release preliminary financials for the First

2  and Second Quarters of 2003 shortly."  A true and correct copy of this

3  announcement, which was linked to Veltex' website, is attached hereto as Exhibit

4  15.  A true and correct copy of the Audit Report of the consolidated balance sheet

5  of Veltex Corporation and Subsidiary, as of the years ending December 31, 2002

6  and 2001, prepared by Tahim and dated January 6, 2004 (the "Tahim Audit

7  Report"), which was available on Veltex' website, is attached hereto as Exhibit 16.

8         (b) A press release on September 24, 2004, stating that audited

9  financials for Veltex' 2001 and 2002 results are available on the company's

10 website.  A true and correct copy of this announcement, which was linked to

11 Veltex' website, is attached hereto as Exhibit 17.

12        (c) A public announcement on September 28, 2004, announcing the

13 hiring of a Utah based auditing firm.  The announcement stated that the "firm is

14 being hired to audit the financials beginning in 2003 and going forward."  It

15 further stated that "[a]ll audited financials for years previous to 2003 can be found

16 at the company's website."  Matin is quoted as stating that "we believe this is a

17 critical step in gaining investor confidence as well as helping with further

18 expansion of our Company."  A true and correct copy of this announcement,

19 which was linked to Veltex' website, is attached hereto as Exhibit 18.

20        (d) A public announcement on October 5, 2004, announcing that the

21 2003 audit should be completed in the next 45-60 days and that the company plans

22 to post the audit on the Veltex website upon completion.  It further stated that

23 "Veltex expects to have its 2004 audit done in the first quarter of 2005."  A true

24 and correct copy of this announcement, which was linked to Veltex' website, is

25 attached hereto as Exhibit 19.

26        (e) A public announcement on October 25, 2004, announcing that

27 Veltex "plans to become a fully reporting Company upon the completion of its

28 2003 audit."  It further stated that Veltex "is currently undergoing the audit by a

- 18 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

SEC licensed auditor." Matin stated that "larger investors and institutional traders will be able to purchase shares of Veltex once the Company is listed on a major exchange and is filing SEC statements." Matin further stated that "[d]uring the first sex months of 2004, we have produced over $20 million in revenues and $3 million in profits." A true and correct copy of this announcement, which was linked to Veltex' website, is attached hereto as Exhibit 20.

(f) A public announcement on November 12, 2004, announcing that Veltex "is currently undergoing its audit for 2003." It further stated that, upon completion of the 2003 audit, "the company plans on becoming fully reporting with the SEC and moving to a larger exchange." A true and correct copy of this announcement, which was linked to Veltex' website, is attached hereto as Exhibit 21.

(g) A public announcement on November 22, 2004, announcing that "Veltex is currently undergoing its 2003 audit and it is expected to be completed in December. The Company then plans on becoming fully reporting and looks to be listed on the American Stock Exchange (AMEX)." A true and correct copy of this announcement, which was linked to Veltex' website, is attached hereto as Exhibit 22.

(h) A public announcement on December 9, 2004, again announcing that "Veltex is currently undergoing its 2003 audit, which the company expects to be completed by years end." It further stated that the "2004 audit will begin as soon as the year is finished. Veltex plans on using the 2004 audit to become fully reporting and move off the Pink Sheets and onto a major exchange." A true and correct copy of this announcement, which was linked to Veltex' website, is attached hereto as Exhibit 23.

(I) A public announcement on December 27, 2004, announcing that Veltex had "completed its acquisition of KCA Garment Industries." It further reiterated that "Veltex is currently undergoing its 2003 audit, which the company

- 19 -

expects to be completed in the near future." It further stated that the "2004 audit will begin in early 2005 and upon its conclusion, Veltex plans on using the audit to become fully reporting and move off the Pink Sheets and onto a major exchange." A true and correct copy of this announcement, which was linked to Veltex' website, is attached hereto as Exhibit 24.

(j) A public announcement on January 5, 2005, again stating that Veltex is undergoing its 2003 audit, which it expects to be completed by February 1, 2005. Matin further stated that, "[a]s soon as our 2004 audit is completed, we plan to become fully reporting and make application to move off the Pink Sheets and onto a major exchange, which will give our company much greater visibility amongst the investment community." A true and correct copy of this announcement, which was linked to Veltex' website, is attached hereto as Exhibit 25.

(k) A public announcement on January 14, 2005, again stating that "Veltex is undergoing its 2003 audit, which the company expects to be completed by February to be immediately followed by the commencement of the 2004 audit." A true and correct copy of this announcement, which was linked to Veltex' website, is attached hereto as Exhibit 26.

(l) A public announcement on February 16, 2005, announcing "preliminary, unaudited, consolidated financial results for Calendar Year Ending December 31, 2004." It further stated that, "[a]s far as 2005, Mr. Matin commented, '[w]e anticipate our completed US GAAP quality audit for 2003 will be issued approximately March 15, 2005. The 2004 audit is expected to be issued approximately April 15, 2005." A true and correct copy of this announcement, which was linked to Veltex' website, is attached hereto as Exhibit 27.

(m) A public announcement on March 17, 2005, announcing that Veltex "received a draft of its 2003 audit to be reviewed by executive officers, attorney and others." It further stated that "Veltex expects to release the audit next

- 20 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1   week."  A true and correct copy of this announcement, which was linked to

2   Veltex' website, is attached hereto as Exhibit 28.

3           (n) A public announcement on March 23, 2005 on the Veltex website

4   titled, "Note to Accompanying Audited Consolidated Financial Statements."  The

5   Note reported:

6           The accompanying audited financial statements have been consolidated in

7           order to assist the reader in gaining an understanding of the totality of the

8           operations of Veltex Corporation and its wholly-owned subsidiary Velvet

9           Textile Mills, Ltd.

10          The financial statements of Veltex Corporation as of December 31, 2003

11          were audited by the accounting firm of Chisholm, Bierwolf & Nilson, LLC

12          in accordance with accounting principles generally accepted in the United

13          States of America.  Chisholm, Bierwolf & Nilson provided an audit report,

14          dated February 10, 2005.

15          The financial statements of Velvet Textile Mills, Ltd. as of December 31,

16          2003 were audited by M.N. Islam & Company, who provided an audit

17          report.

18          The consolidated financial statements have been prepared to show the

19          combined financial position and results of operations of the two above-

20          mentioned entities.  In the opinion of management, they include all of the

21          adjustments which are necessary for a fair presentation.  Any inter-company

22          activities have been eliminated in the consolidation.  The consolidated

23          financial statements have not, in the aggregate, been audited.  However,

24          each of the entities' financial statements was audited individually.  These

25          consolidated financial statements are presented for clarification and

26          discussion purposes only and should not be read without reading the

27          separate financial statements and the attached auditor reports.

28  A true and correct copy of this "Note to Accompanying Audited Consolidated

- 21 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1    Financial Statements," which appeared on Veltex' website, is attached hereto as

2    Exhibit 29. A true and correct copy of Chisholm, Bierwolf & Nilson's

3    Independent Auditor's Report of the unconsolidated balance sheet of Veltex as of

4    December 31, 2003, dated February 10, 2005 (the "CBNM Audit Report"), which

5    was directly accessible on Veltex' website, is attached hereto as Exhibit 30.

6                    (o) A public announcement on March 30, 2005, announcing that

7    Veltex' "independent auditors and certified public accountants have completed an

8    audit of the company financial statements for fiscal 2003." It further states that

9    the audit is available on the Veltex website. The announcement reported that

10   Veltex "reported a net loss of $1,781,342 for the year, with $1,537,840 of the loss

11   pertaining to the Company's trucking operations, which were disposed of during

12   the year." It further reported that Veltex "has assembled basic condensed

13   consolidated financial statements for the year ended December 31, 2003. These

14   consolidated financial statements report the combined results of Veltex

15   Corporation, and its wholly-owned subsidiary, Velvet Textile Mills, Ltd." It

16   further stated that the "consolidated revenues generated by the Company and its

17   subsidiary for the year totaled $15,002,031, with a gross profit of $2,400,196.

18   Consolidated net loss totaled $451,164." Matin further commented that "the

19   audited financial results for fiscal 2003 came in substantially the same as

20   originally reported." A true and correct copy of this announcement, which was

21   linked to Veltex' website, is attached hereto as Exhibit 31.

22                   (p) A public announcement on May 18, 2005, in which Matin stated

23   that "[w]e are disappointed by the delay in the completion of our 2004 audit. We

24   had been previously advised by our auditor to expect the 2004 document by end of

25   Q'2, 2005 and as Veltex Corporation has informed its shareholders of the delay

26   and we have endeavored to inform the investing public of the same unfortunate

27   delay in our press release." Matin further stated that "[s]ubsequently to the

28   original date of Q'2, 2005, the auditors have informed us that due to a backlog in

- 22 -

1  their office regarding previous commitments they would not complete the audit for

2  several additional months."  A true and correct copy of this announcement, which

3  was linked to Veltex' website, is attached hereto as Exhibit 32.

4      49.  The Tahim Audit Report of the consolidated balance sheet of Veltex

5  Corporation and its Bangladesh Subsidiary, Velvet Textile Mills, Ltd., as of the

6  years ending December 31, 2002 and 2001, dated January 6, 2004, was available

7  to the public on the Veltex website.  The Tahim Audit Report states that the audit

8  was conducted in accordance with generally accepted auditing standards.  (*See*

9  Exhibit 16.)  However, the audit failed to conform to GAAP and was substantially

10  deficient.

11      50.  Among other things, Tahim was not in a position to be principal auditor

12  and by serving as principal auditor and relying on the work of the Bangladesh

13  audit, Tahim violated AU Section 543 and the duty of due care.  *See* AU § 543,

14  Part of Audit Performed by Other Independent Auditors, (auditor must consider

15  whether his participation is sufficient to serve as principal auditor and to report on

16  the financial statements and whether to make reference in his report to another

17  auditor's work or report).  The Tahim Audit Report states that they did not audit

18  the statements of Velvet Textile Mills.  The Report explains that the statements of

19  Velvet Textile Mills "were compiled by other auditors whose reports [were]

20  furnished to [them], and [their] opinion, in so far as it relates to the amounts

21  included for Velvet Textile Mills, is based solely on the reports of other auditors."

22  According to the Report, the vast majority of the reported revenue came from

23  Velvet Textile Mills.  Specifically, "[s]ales for the year ended December 31, 2002

24  totals $13, 902, 120, of which $261,878 is US and $13,640,242 is from the

25  Bangladesh operation."  Moreover, the Report states that "[f]or the year ending

26  December 31, 2001, the sales of $8,741,348 all came from the Bangladesh

27  operation."  (*See* Exhibit 16.)  Accordingly, Tahim audited about 1% of the

28  financial statements included in the Tahim Audit Report - 99% of the revenues

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

came from the Bangladesh operation - and Tahim had an affirmative duty to, at minimum, make inquiries concerning the professional reputation and independence of the auditors who provided the reports for Velvet Textile Mills, and at a minimum to re-perform some or all of their work in significant audit areas.  Tahim did not have the ability to assess the fairness of the financial statements due to the reasons mentioned above and would not have been able to opine on the financial statements by referencing to the work performed by the other auditor under the generally accepted auditing standards.  Additionally, the financial statements did not fairly present the financial condition of the company as was represented by Tahim.  Tahim knew or but for her reckless disregard should have known that the financial statements for the fiscal years 2001 and 2002 were materially misstated and not presented in conformity with GAAP.

51.  CBNM was engaged to perform accounting and consulting services and serve as an independent auditor for Veltex on or about September 2004 (*See* Exhibit 18), and continued their engagement with Veltex through at least September 2005.  True and correct copies of billing statements for CBNM's consulting/advisory services, dated April 5, 2005, July 8, 2005 and September 13, 2005 are attached hereto as Exhibit 33.

52.  In or about September 2004, CBNM was contacted to perform an audit for the financial statements of Veltex Corporation as of December 31, 2003.  (*See* Exhibit 18.)  In or about 2004-2005, CBNM did perform an audit.  The CBNM Audit Report states that CBNM "conducted [their] audit in accordance with auditing standards generally accepted in the United States of America." (*See* Exhibit 30.)  The CBNM Audit Report further states

> Those standards require that we plan and perform the audit to obtain
> reasonable assurance about whether the financial statements are free of
> material misstatement.  An audit includes examining, on a test basis,
> evidence supporting the amounts and disclosures in the financial statements.

- 24 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the unconsolidated financial statements referred to above present fairly, in all material respects, the financial position of Veltex Corporation as of December 31, 2003 and the results of their unconsolidated operations and its cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America.

(*See* Exhibit 30.)

53.  CBNM's audit of Veltex' 2003 unconsolidated financial statements violated numerous generally accepted auditing standards and was substantially deficient.  Among other things, CBNM violated the GAAP non-consolidation policy, SFAS 94, which requires auditors to audit a parent company's consolidated financial statements and include subsidiaries if the parent company has majority control with a voting interest, such as here, where Velvet Textile Mills is a wholly owned subsidiary of Veltex.  CBNM's disclaimer does not absolve it from liability.  Under GAAP, CBNM should have audited Veltex' consolidated financial statements or refused the engagement.  In addition, the CBNM Audit Report fails to sufficiently disclose the business risks associated with Veltex shutting down its trucking industry.  Further, the organization of Veltex' business activities is highly deficient in that the CBNM Audit Report only includes information regarding Veltex' trucking operations, but the press releases indicate that Veltex was engaged in numerous other business activities.

54.  CBNM also failed to comply with AICPA Standards relating to communications with the prior auditor.  *See* AU § 315, Communication Between Predecessor and Successor Auditors, at .03, .07 &.09 (auditor should not accept an engagement until after "necessary procedure" of inquiring with predecessor

- 25 -

First Amended Complaint

1    auditors about integrity of management, disagreements with management

2    regarding accounting principles or auditing procedures, communications with the

3    audit committee regarding client fraud or illegal acts, and the reason for change of

4    auditors); .11 (auditor should request permission to review predecessor's work

5    papers).  CBNM never communicated with Veltex' former auditors.

6         55.  Under GAAP, in order to complete the audit, CBNM would have had to

7    meet with Veltex' senior management.  This would have included Olesk who, in

8    addition to being general counsel to Veltex during the relevant period, is also a

9    Certified Public Accountant and was in charge of approving all press releases

10   issued by the company.  The press releases issued by the Management Defendants

11   during the period in which CBNM was performing the audit and providing

12   consulting services for Veltex repeatedly indicated that Veltex was in the process

13   of becoming a fully reporting company and moving off the Pink Sheets and onto a

14   major exchange.  Moreover, the Management Defendants informed CBNM that

15   they intended to make Veltex fully reporting.  Accordingly, CBNM knew that the

16   Management Defendants intended to make Veltex fully reporting and thus CBNM

17   was under an obligation to look back at Veltex' 2001-2002 financials.  If CBNM

18   did review Veltex' prior audit reports, as they were required to do under AU §

19   315, CBNM would have been aware of the inconsistencies between the financial

20   information being provided to them by the Management Defendants and the

21   financials that were reported in prior press releases.

22        56.  Moreover, although CBNM purported to audit the unconsolidated

23   financial statements of Veltex Corporation, the Utah corporation, for the year

24   2003, CBNM relied, at least in part, upon the financial statements of Veltex USA,

25   a wholly unrelated Delaware corporation owned entirely by Matin.

26        57.  Moreover, Matin and the Management Defendants issued numerous

27   press releases informing the general investing public of the audit in an attempt to

28   establish the financial credibility of the company.  In the course of the audit,

- 26 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1  CBNM became aware or should have become aware that Veltex was not a going
2  concern and that providing Veltex with an audited financial would allow Matin
3  and the Management Defendants to give the appearance to the general investing
4  public that the company was bona fide.

5      58.  Throughout 2007, Matin again represented to shareholders that Veltex
6  was having an audit performed of its financial affairs by a Certified Public
7  Accounting Firm.  Matin reiterated this representation in the March 5, 2008 press
8  release, stating:

9      [T]he time, cost, and effort for completing separate audits for the US
10      Canada, and Bangladesh and then preparing consolidated financial reports
11      have proved much greater than anticipated.  We continue to work diligently
12      with our CPA firm to complete the task.  Our Independent Auditor, Mike
13      More [sic], CPA is a member of the Public Companies Accounting
14      Oversight Board (PCAOB).

15  (*See* Exhibit 13.)

16      59.  The true facts, however, were that Veltex' designated auditor, Moore
17  and Moore & Associates, had actually resigned as of at least March 6, 2008, two
18  days after the press release was issued.  Notwithstanding their resignation, Matin
19  and the other Management Defendants never informed the shareholders and
20  members of the investing public of this material fact and event.

21      60.  Despite the false impression left by Matin's and the other Management
22  Defendants' repeated assertions that Veltex was having audited financials
23  prepared, this was blatantly untrue.  These were material facts which should have
24  been affirmatively disclosed to shareholders and the investing public, but were
25  not.

26      61.  Starting in 2004, and thereafter, millions of Veltex shares were sold,
27  due, at least in part, to the press releases issued by Matin and the Management
28  Defendants regarding the Audit Reports prepared by Tahim and CBNM, which

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

- 27 -

1   helped create the false impression of a viable, thriving company.  Beginning in

2   2004, after the announcement of Veltex' audited financials by Tahim, millions of

3   shares of Veltex stock were sold generating in excess of $30 million, and allowing

4   Matin and the Management Defendants, with the assistance of the attorneys,

5   accountants and transfer agents, who are named as party-Defendants herein, to

6   perpetrate the "pump and dump" scheme.

7       **G.    Conflicts of Interest and Misappropriation of Veltex**

8               **Corporate Assets**

9       62.  Matin and the other Management Defendants have diverted assets and

10   revenue of Veltex, and engaged in egregious self-dealing and malfeasance as is

11   alleged herein.  Matin has admitted in judicial proceedings against him in

12   California that he used Veltex funds to purchase three homes for himself,

13   including a 15,000 square foot residence in Diamond Bar, California.  This use of

14   the corporate funds of Veltex was neither approved by an independent Board of

15   Directors, nor was it ever disclosed to Veltex' shareholders or members of the

16   general investing public.

17      63.  Funds and assets belonging to Veltex were also transferred from time to

18   time to Wilshire Equity, a company wholly owned by Matin.  Wilshire Equity has

19   neither supplied Veltex with goods nor provided it with any services.  The

20   transactions with Wilshire Equity have never been approved by an independent

21   Board of Directors, and never disclosed to Veltex' shareholders or members of the

22   general investing public.

23      64.  Matin's wife, Sultana, has also received payments from time to time

24   from Veltex, even though she performed no services for the corporation.  Again,

25   payments to her were never authorized or approved by an independent Board of

26   Directors nor disclosed to shareholders or members of the general investing

27   public.

28      65.  Matin also sold off Veltex' inventory at substantial discounts, and he,

- 28 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1  Campbell and Hague used the proceeds personally and/or funneled them into other

2  entities or accounts over which Matin exercised control.

3  **H.    The Orchestration of the "Pump and Dump Scheme"**

4  66. The "pump and dump" scheme was operated primarily though Wilshire

5  Equity, the Colorado corporation owned entirely by Matin.  Wilshire was the

6  vehicle that received the inflated, unrestricted and legend free Veltex common

7  stock shares which were then sold to unsuspecting investors through several

8  smaller, regional brokerage accounts in California and in Utah.  The scheme was

9  perpetrated from 2004 through early 2008, through the sale of millions of shares in

10  Veltex, which at all relevant times in this Complaint was being falsely represented

11  to the general investing public as a highly successful, financially sound and

12  profitable company, when in fact it was financially strapped, debt-ridden and

13  mismanaged.  The Management Defendants, together with Olesk, fraudulently

14  "pumped" the market for the sale of Veltex stock and by creating the false

15  impression of Veltex as a thriving company, that enabled Defendants to capitalize

16  on the ensuing market for the Veltex stock that was being sold.

17  67. Because Wilshire Equity was wholly owned by Matin, who was also the

18  CEO and Chairman of the Board of Veltex, he was deemed to be an "affiliate" of

19  Veltex, and under applicable law, *i.e.*, the 1933 Act, the Veltex shares transferred

20  to Wilshire were required to bear a restrictive legend by the transfer agent at the

21  time the shares were issued, unless an attorney certifies that under Regulation D,

22  Rule 504 of the 1933 Act, the proposed shares are "legend free shares".

23  68. For the past several years, Defendants Olesk and Bua (sometimes

24  collectively referred to herein as "Attorney Defendants") knowingly and falsely

25  prepared such Rule 504 letters authorizing the issuance of legend free and

26  unrestricted Veltex shares by ARTCO which were then placed into the accounts of

27  Wilshire Equity or another affiliated or related entity.  Bua has recently been

28  charged by the Securities and Exchange Commission (the "SEC") with similar

- 29 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1   activity in Florida.

2   69. From January 21, 2005 to January 8, 2008, Bua authored at least thirty-

3   three (33) "504 D" letters on behalf of Veltex, authorizing the transfer of

4   approximately seventeen million (17,000,000) shares of unrestricted, legend free

5   Veltex common stock. True and correct copies of a sampling of ten of the "504

6   D" letters Bua prepared as the "Securities Attorney for Veltex" are attached hereto

7   as Exhibit 34. A true and correct copy of Form D, dated October 7, 2005, which

8   Bua prepared as "General Counsel" to Veltex and submitted to ARTCO along

9   with his "504 D" letters, is attached hereto as Exhibit 35. Bua charged Veltex and

10  received as compensation as much as $1,000.00 for each such false "504 D" letter

11  he prepared. True and correct copies of various billing statements submitted by

12  Bua to Veltex and checks issued by Veltex to Bua are attached hereto as Exhibit

13  36.

14  70. Once the fraudulent "504D" letter was issued, Matin, or one of the

15  other Management Defendants, would then send it to ARTCO and request that the

16  unrestricted stock shares be issued to Wilshire Equity or one of the other entities

17  involved in the scheme. (*See* Exhibit 34.) Matin, or other of the Management

18  Defendants, knew or recklessly disregarded that the factual predicates for the

19  purported legal opinions upon which they were relying to request the share

20  issuance, were false and/or misleading.

21  71. Bua knew, or consciously and recklessly disregarded, that no securities

22  law exemption was available in these offerings; that the 504D letters he issued

23  were false and misleading; and that he was instrumental in drafting the documents

24  that resulted in the fraudulent issuance of the unrestricted Veltex shares at the

25  heart of the scheme.

26  (a)   At the time Bua authored his opinion letters, he knew of, or

27  consciously and recklessly disregarded, the affiliate relationship between Veltex,

28  Matin and Wilshire Equity. Haque, in his capacity as CFO of Veltex, signed each

- 30 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1    check Bua received for the "legal services" he provided to Veltex. (*See* Exhibit

2    36.) Haque also signed the Securities Purchase Agreements, in his capacity as

3    President of Wilshire Equity, upon which Bua necessarily relied in issuing his

4    opinion letters. True and correct copies of two (2) Securities Purchase

5    Agreements executed by Haque on behalf of Wilshire Equity are attached hereto

6    as Exhibit 37. Accordingly, Bua knew of, or consciously and recklessly

7    disregarded, the affiliate relationship based on the fact that he knew that Haque

8    was CFO and a Board member of Veltex and also President of Wilshire Equity,

9    and should have known or had good reason to know that the facts provided to him

10   by Matin and the Management Defendants were inaccurate.

11         (b)    Richard Day of ARTCO faxed Bua numerous letters informing

12   him that many of the representations in his 504D letters were inaccurate. For

13   instance, on July 1, 2005, Richard Day faxed Bua a letter in response to his request

14   that ARTCO issue 300,000 shares of Veltex stock pursuant to Rule 504 and based

15   upon Bua's opinion letter in respect thereof. The letter further states that Bua's

16   "opinion letter is based (in pertinent part) on a representation by Veltex that it has

17   not utilized Rule 504 within the last 12 months. . . .However, we have certain

18   knowledge that Veltex has utilized Rule 504 within the last 12 months, and in fact

19   on numerous occasions and based on opinions provided by you." In support of his

20   assertion, Richard Day attached copies of 18 transmittals reflecting issuance of

21   Veltex shares in reliance on Rule 504 within the last 12 months and requested that

22   Bua provide a revised opinion based thereon. A true and correct copy of this

23   faxed letter from Richard Day, dated July 1, 2005, is attached hereto as Exhibit 38.

24         (c)    A fax from Richard Day dated September 30, 2005 points out

25   numerous inconsistencies in another opinion letter issued by Bua, including the

26   fact that the Veltex officers listed on the Form D filed with the SEC are not, and

27   were not as of the date of the form, officers of Veltex. Moreover, one of the

28   officers listed was long deceased. A true and correct copy of this faxed letter from

- 31 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1  Richard Day, dated September 30, 2005, is attached hereto as Exhibit 39.

2         (e)    In addition, Bua responded to another letter from Richard Day

3  requesting the basis for the share purchase discount per Bua's earlier opinion letter

4  of August 7, 2007 in support of Veltex' request to issue 1,000,000 free trading

5  shares to Wilshire Equity pursuant to Regulation D, Rule 504. A true and correct

6  copy of this faxed letter from Bua, dated August 24, 2007, is attached hereto as

7  Exhibit 40.

8         (f)    On August 5, 2005, Bua sent a letter to Matin and Jay Fung

9  ("Fung"), managing member of Wan Tsing Enterprises, LLC and Max Capital

10  Holdings, LLC, two of the entities Veltex issued unrestricted securities to based

11  on Bua's 504D letters. (*See* Exhibit 34.) In this letter, Bua informed Matin and

12  Fung that,

13      [T]he [Pennsylvania Division of Corporate Finance (the "DOF")], has

14      changed its policy with respect to Section 203(t) in that as a part of its

15      review process it will now require that a legend be placed on all

16      disclosure documents, the Subscription Agreement and the actual share

17      certificate that states that the shares may **only be sold during the first**

18      **12 months to another accredited investor**.

19      This legend requirement eliminates the original Rule 504 "free trading"

20      shares that were able to be sold on the open market.

21      Please note that the Texas Rule 504 share issuance exclusively to

22      accredited investors is still available to create "free trading" shares.

23  A true and correct copy of this letter from Bua, dated August 5, 2005, is attached

24  hereto as Exhibit 41 (emphasis in original).

25         (g)    Significantly, prior to Bua's sending this letter, the 504D

26  opinion letters were issued to "Pennsylvania Residents," Wilshire Equity and Max

27  Capital Holdings, LLC, at the same address in Berwyn, Pennsylvania. (*See*

28  Exhibit HH.) After August 5, 2005, Bua issued 504D letters in support of requests

- 32 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1  to transfer shares to, among others, "Texas Residents," Wilshire Equity and Wan

2  Tsing Enterprises, LLC. (*See* Exhibit 34.)  Four (4) other entities that Veltex

3  issued unrestricted shares to based on Bua's 504D letters, Golden Gate Investors,

4  Inc., Cumbuco Beach, Inc., Vigilant Traders, Inc., and One Equity Group Corp.,

5  share the exact same Austin, Texas address as Wilshire Equity. (*See* Exhibit 34.)

6  Moreover, the Securities Purchase Agreements entered into between Veltex and

7  Vigilant Traders, Inc., and Veltex and One Equity Group Corporation were both

8  executed by Haque in his capacity as President of both entities.  True and correct

9  copies of the Securities Purchase Agreements entered into between Veltex and

10  Vigilant Traders, Inc., and Veltex and One Equity Group Corporation are attached

11  hereto as Exhibit 42.

12      72.  ARTCO, which operated as Veltex' share transfer agent, financially

13  benefitted from each such transfer it effected. Defendant Patrick Day, who is the

14  President of ARTCO (and whose father, Richard Day, is the majority owner of

15  ARTCO, and had been one of Veltex' outside securities attorneys), was also a

16  Director of Veltex at the same time ARTCO served as Veltex' share transfer agent.

17  Upon receipt of the "authorization letter" from Matin or other of the Management

18  Defendants, ARTCO would then issue the legend free and unrestricted shares to

19  Wilshire Equity or one of the other entities, and they would then be sold directly

20  on the open market to unsuspecting members of the general investing public, or in

21  turn transferred to other nominees controlled by Matin and the other Management

22  Defendants, who then sold them to the public.

23      73.  During the operation of this carefully orchestrated scheme, Matin,

24  Olesk and other Officers and Directors of Veltex caused numerous false and

25  misleading press releases to be issued and posted on the internet in furtherance of

26  the "pump and dump" scheme.  For example, in a Veltex press release issued on or

27  about February 7, 2007, prepared by or at the direction of Matin, Campbell and

28  Haque, and with the knowledge and approval of Sultana and Olesk, Veltex's

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

- 33 -

1  revenue for the year 2006 was falsely and fraudulently reported to be more than

2  $70,000,000.00 and its net income at more than $5,000,000.00.  A true and correct

3  copy thereof is attached hereto as Exhibit 43.  That same press release also falsely

4  reported that Veltex had assets in excess of $53,000,000.00.  On or about August

5  27, 2007, another Veltex press release falsely reported Veltex' sales for the first

6  quarter of 2007 to be more than $18,000,000 and its net profit nearly $2,000,000.

7  A true and correct copy thereof is attached hereto as Exhibit 44.  Matin, Campbell

8  and Haque, with the knowledge and approval of Sultana and Olesk, also issued

9  false press releases at to the number of outstanding Veltex shares, materially

10 understating the true number of such outstanding shares.

11      74.  Moore, Moore & Associates, CBNM, Haynes and Tahim (sometimes

12 collectively referred to herein as the "Accountant Defendants"), each, at varying

13 times, expressed views as Veltex' auditors and accountants, as to the accuracy of

14 its revenue, profit, asset and outstanding shares, knowing that Veltex' publicly

15 stated information was false and misleading.  The verification of false financial

16 results by independent third parties is an important component of the "pump and

17 dump" scheme because it leads unsuspecting investors to believe that false

18 financials are, in fact, legitimate, accurate and true.  Matin persistently stated

19 publicly that audited financials were being prepared for Veltex, and despite having

20 so stated over a number of years, no such audited statements were actually

21 produced.  In actuality, an audit was being prepared for two completely different

22 entities – Veltex Apparel and Veltex USA – both of which are entities owned and

23 controlled by Matin, and named as Defendants herein.  In truth, no audit was being

24 prepared for Plaintiff Veltex, contrary to the materially false representations being

25 made by Matin and the other Management Defendants, which the knowledge and

26 approval of Olesk and others.

27      75.  The March 4, 2008 press release announced that Veltex was

28 restructuring the company and adopting a new business model.  That press release

First Amended Complaint

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1   represented that, in connection with the preparation of audits and consolidated
2   financial reports, Veltex was continuing to work diligently with its "CPA firm" –
3   Moore & Associates, and its "Independent Auditor, Mike More [*sic*] CPA" , who
4   is touted as a member of PCAOB.  It also reported that Veltex' manufacturing
5   facilities had been sold.  In that same press release, Matin is quoted as stating:
6   "We are predicting revenues of $10 to $15 million in 2008."  Though not
7   disclosed in the press release, Matin and Olesk told a major investor that Veltex
8   had received $4,000,000 in connection with the sale of that textile manufacturing
9   facility, when in fact no such money has ever been received.  It was also later
10  discovered that the textile manufacturing facility located in Bangladesh that
11  Veltex purportedly owned, was never in fact owned by Plaintiff Veltex.
12  Moreover, two days after the March 4, 2008 press release was issued, Moore &
13  Associates resigned as Veltex' auditors, a fact never disclosed by Veltex'
14  management to its shareholders or to members of the investing public.  These are
15  material facts that should have been affirmatively disclosed, but were not, and the
16  failure to do so by Matin, Campbell and/or Haque, misled shareholders and
17  members of the general investing public regarding the true status of Veltex'
18  financial condition and stability.  No effort whatsoever was made to correct the
19  misleading and blatantly inaccurate information disseminated in the Veltex press
20  releases.  Olesk, as Veltex' corporate counsel, was specifically charged with the
21  responsibility of reviewing and approving all Veltex' press releases prior to
22  issuance.  He, too, failed to assure that all material facts and the true status of
23  Veltex' financial condition and stability were disclosed in all of Veltex' press
24  releases.

25  76.  Matin and Haque were complicit in the perpetration of a massive, and
26  illegal, check kiting scheme through the issuance of false and misleading bank
27  statements for Veltex, which Matin and Haque used to "verify" the revenues of
28  Veltex.  The scheme consisted of shifting money back and forth between the two

- 35 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

banks at which Veltex maintained its corporate accounts, on an almost daily basis, so as to create the impression that both banks had large Veltex deposits when in fact the opposite was true.

77. No disclosure has ever been made by the Management Defendants, or any of the other Defendants of the foregoing false and misleading facts and events to the investing public, and no effort whatsoever was ever made to correct the misleading and blatantly inaccurate information that had been provided in the Veltex press releases and other offering materials over a several year period, which was integral to the perpetration and success of the "pump and dump" scheme.

78. Matin has secreted and conveyed his personal assets to his wife, Sultana, and possibly others, with the intent to hinder, delay and defraud Veltex and others victimized by the "pump and dump" scheme or, alternatively, has transferred assets to Sultana without receiving reasonably equivalent value in exchange for the transfer. This included the use of such funds by Sultana to purchase a multimillion dollar home in Diamond Bar, California. Matin, Campbell and Haque also used proceeds from the illegal sales of Veltex stock to pay their personal expenses, including, among other things, travel expenses, living expenses, taxes and car payments.

79. Matin, Campbell and Haque have secreted and conveyed the assets of Veltex to Sultana and possibly others, with the actual intent to hinder, delay and defraud Veltex and others victimized by the "pump and dump" scheme or, alternatively, they have transferred Veltex assets to Sultana without receiving reasonably equivalent value in exchange for the transfer.

First Amended Complaint

# V.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Securities Fraud

### (Against All Defendants)

80. Plaintiff repeats and realleges all of the allegations in paragraphs 1-65, as though fully set forth herein.

81. Defendants, and each of them, conceived and carried out a systematic plan, scheme and course of conduct during the time periods covered by the Complaint, which was intended to and did (a) deceive the investing public, including purchasers of Veltex stock; (b) cause Veltex stock to be wrongfully issued, obtained and sold; (c) manipulate, artificially inflate and maintain the price of Veltex stock; (d) cause investors to purchase Veltex stock at such artificially inflated prices; and (e) diminish and largely eviscerate the value of Veltex' stock and Veltex as a going concern. They did so by knowingly making material misrepresentations of fact as alleged herein, with scienter, in connection with the sale of securities, causing severe economic loss and harm to Veltex and its shareholders.

82. During the relevant time periods covered by this Complaint, Matin, Campbell, Haque, Bender and Day, were Officers and/or Directors of Veltex, and in charge of its financial information and its communication with the public regarding the financial affairs and condition of Veltex. They acted with the advice, consent and approval of Sultana, Olesk and Bua. The Attorney Defendants, Olesk and Bua, provided legal services integral to the perpetration of the wrongful scheme, as alleged herein. The Accountant Defendants, Moore, Moore & Associates, CBNM, Haynes and Tahim, provided accounting services integral to the perpetration of the wrongful scheme, as alleged herein. The Accountant Defendants knew, or consciously and recklessly disregarded, that the

- 37 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

Management Defendants intended to and did misuse the imprimatur of "legitimacy" of Veltex' financial statements and information created by their retention and performance as the CPA's/auditors for the corporation. Yet they failed to obtain complete and accurate information and/or failed to correct overvalued, incomplete and false information regarding Veltex, which they knew was being disseminated to the general investing public by the Managment Defendants, and being relied on by members of the general investing public to purchase stock in Veltex at artificially inflated prices. Day and ARTCO, which operated as Veltex' share transfer agent, played integral roles in the issuance of the illegal shares, as alleged herein.

83. As part of the foregoing scheme, Matin, Campbell and Haque, acting with the advice, consent and approval of Sultana and Olesk, knowingly and intentionally entered into and engaged in the scheme to defraud the public by issuing materially false and misleading statements concerning the financial affairs and condition of Veltex to induce the public to buy the artificially inflated shares of Veltex. In issuing press releases with materially false revenue and profit figures, Defendants used instrumentalities of interstate commerce, including the mails, interstate telephone, wire and the internet.

84. The conduct described above, including without limitation, the dissemination of materially false revenue and profit figures by Matin, Campbell and Haque, with the advice, consent and approval of Sultana and Olesk, as well as the failure to disclose the true and correct sales and earnings of Veltex, constitutes a violation of Section 10b-5 of the Securities Act of 1934, 15 U.S.C. § 78j(b) and Rule 10(b)-5 promulgated thereunder, 17 C.F.R. § 240, 10b-5.

85. The conduct described above, including without limitation, the dissemination of false revenue and profit figures by Matin, Campbell and Haque, with the advice, consent and approval of Sultana and Olesk, as well as the failure to disclose the true and correct sales and earnings of Veltex, constitutes a violation

1  of Section 12(2) and/or 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77l(2),

2  77q(a).

3      86.  Each of the Defendants herein were aware of the unlawful scheme and

4  plan, and actively, knowingly, intentionally, consciously and with scienter

5  participated in its accomplishment by playing a specific role in that process, as

6  alleged herein.

7      87.  As a direct and proximate result of such violations of the federal

8  securities laws, the stock and going concern value of Veltex has been diminished

9  and eviscerated in an amount in excess of thirty-five million dollars ($35,000,000)

10 to be proven at trial.

11     88.  By engaging in the foregoing conduct in violation of the federal

12 securities laws, and acting for their own personal benefit and wealth enhancement,

13 Matin, Campbell, Haque, Sultana and Olesk have acted with oppression, fraud and

14 malice, entitling Veltex to exemplary and punitive damages, in an amount

15 sufficient to punish and make an example of them, in an amount to be determined

16 by the jury at the time of trial.

17                **SECOND CLAIM FOR RELIEF**

18            **Fraudulent Transfer and Conveyance**

19      **(Against Defendants Matin, Campbell, Haque and Sultana)**

20     89.  Plaintiff repeats and realleges all of the allegations in paragraphs 1-65,

21 as though fully set forth herein.

22     90.  Matin has secreted and conveyed his personal assets to his wife,

23 Sultana, a Defendant herein, and possibly others, with the actual and fraudulent

24 intent to hinder, delay and defraud Veltex and others victimized by the "pump and

25 dump" scheme or, alternatively, has transferred assets to Sultana without receiving

26 reasonably equivalent value in exchange for the transfer, in violation of Sections

27 4(a) and 5(b) of the Uniform Fraudulent Transfer Act ("UFTA"), California Civil

28 Code § 3439.04(a) and (b).

- 39 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

91.  Matin, Campbell and Haque have secreted and conveyed the assets of Veltex to Sultana, and possibly others, with the actual intent to hinder, delay and defraud Veltex and others victimized by the "pump and dump" scheme or, alternatively, they have transferred Veltex assets to Sultana without receiving reasonably equivalent value in exchange for the transfer  in violation of Sections 4(a) and 5(b) of UFTA, California Civil Code § 3439.04(a) and (b).

92.  Under Section 7(a)(1) of UFTA, California Civil Code § 3439.07(a)(1), the Court is authorized to void the fraudulent transfer of any assets of Veltex, Matin, Campbell, Haque and Sultana.  Plaintiff Veltex hereby requests that such relief be granted.

### THIRD CLAIM FOR RELIEF

### Conspiracy to Breach and Breach of Fiduciary Duty

### (Against Defendants Matin, Campbell, Haque, Bender and Day)

93.  Plaintiff repeats and realleges all of the allegations in paragraphs 1-65, as though fully set forth herein.

94.  In their capacity as the highest Officers and Directors of Veltex, Matin, Campbell, Haque, Bender and Day, and each of them, owed to Veltex those obligations owing in a fiduciary relationship founded on undivided loyalty, honesty, independent judgment and conduct, to best represent and enhance the interests of the corporate entity, Veltex.

95.  As Directors, Matin, Campbell, Haque, Bender and Day stood in a fiduciary relationship of trust and confidence with the corporation, Veltex, and its shareholders.  As a result, they owed fiduciary duties of diligence and fidelity in performing their duties.  They were required to serve in good faith, and in the best interests of the corporation and its shareholders, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.  They were specifically precluded from engaging in intentional misconduct or knowing inculpable violations of the law; conduct that

- 40 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1  was contrary to Veltex' or its shareholder's best interests or involved an absence

2  of good faith; transactions in which they derived an improper personal benefit;

3  reckless disregard for their duty to Veltex or its shareholders when they were

4  aware or should have been aware of the wrongful conduct by other officers,

5  directors or other professionals performing services on behalf of Veltex and the

6  risk of serious injury to Veltex and its shareholders being caused thereby;

7  inexcusable inattention, amounting to an abdication of duty to Veltex and its

8  shareholders; entering into or condoning transactions in which they or other

9  corporate officers or directors have a conflict of interest; and engaging in or

10  condoning prohibited corporate loans or distributions.

11      96.  Concomitant with their fiduciary duty of care, as directors of Veltex,

12  Matin, Campbell, Haque, Bender and Day owed a fiduciary duty of loyalty to

13  Veltex.  That meant they were obligated, among other things, to place Veltex' and

14  its shareholders' interests ahead of any other business or personal interests; being

15  a party to any false statement or entry in the corporate records or to any

16  exaggerated report or other document which would tend to give Veltex greater

17  value than it actually possesses; and knowingly and wilfully issuing shares in

18  violation of the law with the intent to defraud future shareholders or creditors.

19      97.  As Officers of Veltex, who participated in corporate management,

20  Matin, Campbell and Haque also owed fiduciary duties of undivided care and

21  loyalty to Veltex.

22      98.  Defendants Matin, Campbell, Haque, Bender and Day breached their

23  fiduciary duties by causing Veltex to engage in, submit to and/or approve the

24  conduct and transactions described in this Complaint with respect to actions which

25  caused the dilution of the stock of common shares and the value of Veltex as a

26  going concern, all to the detriment of Veltex, and for their sole and exclusive

27  benefit. Said Defendants, as members of the Veltex Board of Directors, and as

28  Officers of the corporation, suffered from egregious conflicts of interests and

- 41 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

1  engaged in self-dealing which prevented them from exercising independent

2  judgment.  The conduct of said Defendants also did not comply with the

3  requirements of the business judgment rule.  In diluting the value of Veltex shares,

4  raiding corporate assets and diminishing the overall value of the corporation, said

5  Defendant failed to act with the degree of diligence, care, loyalty and skill

6  ordinary prudent persons would exercise under similar circumstances in like

7  positions.

8  99.  By combining and conspiring to engage in the conduct alleged herein,

9  specifically the conception and execution of the "pump and dump" scheme, and by

10 actually engaging in and implementing such a scheme, these Defendants breached

11 their respective fiduciary duties to Veltex and its shareholders.

12 100.  The conduct of said Defendants, as alleged herein, constitutes a

13 common law breach of fiduciary duty under the laws of the States of California

14 and Utah. Such conduct also in violation of specific statutes of the States of

15 California and Utah related to corporate governance and management, including

16 but not limited to, Section 300 *et seq*. of the California Corporations Code and the

17 Utah Revised Business Corporation Act, Utah Code Ann.§ 16-10a-101 *et seq*.

18 101.  As a direct and proximate result of Defendants' breaches of their

19 fiduciary duties, Veltex has suffered a diminution in the value of its stock and

20 going concern value, and suffered damages, in an amount in excess of thirty-five

21 million dollars ($35,000,000) to be proven at trial.

22 102.  The acts and conduct of said Defendants as alleged herein, constitute

23 despicable and malicious conduct, with the intention of damaging Veltex, and for

24 their own personal benefit and wealth enhancement.  Matin, Campbell, Haque and

25 Bender have acted with oppression, fraud and malice, entitling Veltex to

26 exemplary and punitive damages, in an amount sufficient to punish and make an

27 example of them, in an amount to be determined by the jury at the time of trial.

28

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

## FOURTH CLAIM FOR RELIEF

### Professional Negligence – Attorney Malpractice

### (Against Defendants Olesk and Bua)

103. Plaintiff repeats and realleges all of the allegations in paragraphs 1-65, as though fully set forth herein.

104. In acting as corporate legal counsel for Veltex and outside securities counsel and general counsel for Veltex, respectively, Olesk and Bua, and each of them, had an attorney-client relationship with Veltex.  When Olesk and Bua handled Plaintiff's legal matters, they had a legal duty to exercise that degree of learning, and use the degree of care and skill, ordinarily possessed by a reputable attorney or law firm, practicing under similar circumstances.  Said Attorney Defendants (a) had a duty to use reasonable diligence and their best judgment in the exercise of skill and the application of learning; (b) had a duty to use the skill, knowledge and care that a reasonably careful attorney or law firm would have used in similar circumstances; and (c) owed all customary professional and fiduciary duties to Plaintiff and owed a duty of loyalty to Plaintiff not to act adversely to Plaintiff's interests, and to refrain from taking any action or omitting to take any action which was likely to result in loss, injury, damage, harm or detriment to Plaintiff Veltex.

105. By combining and conspiring to engage in the conduct hereinbefore alleged, specifically the conception and execution of the "pump and dump" scheme, and by actually engaging in and implementing such a scheme, Olesk and Bua breached these legal duties to Veltex, including their respective duties to Veltex imposed by the attorney-client relationship and decisional law and statutes. The conduct of the Attorney Defendants fell far below the applicable standard of care.

106. As a result of the actions, errors and omissions, set forth above, Olesk and Bua have breached such legal duties, and have been professionally negligent.

107.  As a direct and proximate result of such professional negligence, and by reason of these respective breaches by the Attorney Defendants, Olesk and Bua, of their duties owing to Veltex, Plaintiff Veltex has suffered a diminution in the value of its stock and going concern value in an amount in excess of thirty-five million dollars ($35,000,000) to be proven at trial.

108.  The acts and conduct of said Defendants as alleged herein, constitute despicable and malicious conduct, with the intention of damaging Veltex, and for their own personal gain and benefit.  The Attorney Defendants, Olesk and Bua, have acted with oppression, fraud and malice, entitling Veltex to exemplary and punitive damages, in an amount sufficient to punish and make an example of them, in an amount to be determined by the jury at the time of trial.

### FIFTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty – Attorneys

### (Against Defendants Olesk and Bua)

109.  Plaintiff repeats and realleges all of the allegations in paragraphs 1-65, as though fully set forth herein.

110.  In acting as corporate counsel for Veltex and outside securities counsel and general counsel for Veltex, respectively, Olesk and Bua, and each of them, owed to Veltex the obligations owing in a fiduciary relationship founded on the trust and confidence of the attorney-client relationship consisting of (a) the duty to exercise such skill, prudence and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of tasks they undertake; (b) the duty to act only in the best interest of Veltex and not with self-interest or motivated in the case of conflict to represent the interests of Matin, Campbell, Haque over that of Veltex; and (c) those obligations owing in a fiduciary relationship founded on the trust and confidence necessary for an attorney-client relationship, including undivided loyalty, zealous representation and independent judgment.

- 44 -

111.  Olesk and Bua, by virtue of their respective attorney-client relationships with Veltex, as alleged herein, owed Veltex a fiduciary duty, and by virtue of Veltex having reposed trust and confidence in the fidelity, integrity and competence of Olesk and Bua, a confidential relationship existed between Veltex and said Defendants.

112.  By combining and conspiring to engage in the conduct hereinbefore alleged, specifically the conception and execution of the "pump and dump" scheme, and by actually engaging in and implementing such a scheme, Olesk and Bua breached these fiduciary duties to Veltex, including their respective duties to Veltex imposed by the attorney-client relationship and decisional law and statutes. The Attorney Defendants failed to act competently and failed diligently to conform to the fiduciary obligations they owed to Veltex.

113.  By reason of these respective breaches by Olesk and Bua of their duties owing to Veltex, Plaintiff Veltex has suffered a diminution in the value of its stock and going concern value in an amount in excess of thirty-five million dollars ($35,000,000) to be proven at trial.

114.  The acts and conduct of said Defendants as alleged herein, constitute despicable and malicious conduct, with the intention of damaging Veltex, and for their own personal gain and benefit.  Olesk and Bua have acted with oppression, fraud and malice, entitling Veltex to exemplary and punitive damages, in an amount sufficient to punish and make an example of them, in an amount to be determined by the jury at the time of trial.

### SIXTH CLAIM FOR RELIEF

### Professional Negligence – Accountant Malpractice

### (Against Defendants Moore, Moore & Associates, CBNM, Haynes and Tahim)

115.  Plaintiff repeats and realleges all of the allegations in paragraphs 1-65, as though fully set forth herein.

- 45 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

116. In providing accounting/auditing and financial consulting services to Veltex, and acting as Veltex' auditors/CPAs, Defendants Moore, Moore & Associates, CBNM, Haynes and Tahim owed to Veltex their undivided loyalty as well as a duty to exercise such skill, prudence and diligence as accountants/auditors of ordinary skill and capacity commonly possess and exercise in the performance of the tasks they undertake. Said Accountant Defendants were obligated to exercise their professional skill and talent on behalf of and/or for the benefit of Veltex, in rendering professional accounting, auditing and related consulting services to Veltex.

117. Defendants Moore, Moore & Associates, CBNM, Haynes and Tahim breached this duty of care and undivided loyalty, and failed to provide Veltex with the professional accounting services to which Veltex was entitled. Said Defendants operated for and on behalf of the interests of individual Officers and Directors, who stood to gain from their malfeasance, as well as for their own interests, which interests were contrary to and in conflict with the best interests of Veltex, and for the purpose of increasing their own compensation for services. Said Defendants breached their duties of due care and professional competence by, among other things, failing to render services in accordance with professional standards of care, including GAAS; preparing and/or approving financial statements that were not prepared in accordance with GAAP; negligently failing to disclose to Veltex material inaccuracies in its books and records and/or creating such false and inaccurate entries; failing to exercise due diligence in its examination, evaluation and verification of Veltex' assets, liabilities and financial transactions; issuing "clean" audit or other opinions or letters purporting to verify the accuracy of the financial condition and assets of Veltex; intentionally and/or negligently rendering accounting services and advice to the Managing Defendants which allowed them to perpetrate the securities fraud alleged herein and to raid and misuse corporate assets for their own personal gain and financial benefit; and

- 46 -

by assisting the Managing Defendants in hiding the true facts as to Veltex' assets and liabilities, and its inability to proceed as a going concern.

118. Defendants Moore, Moore & Associates, CBNM, Haynes and Tahim knew, or through the exercise of reasonable care, should have known, that the Managing Defendants intended to and did misuse the imprimatur of "legitimacy" of Veltex' financial statements and information created by their retention and performance as the CPAs/auditors for the corporation. Yet they failed to obtain complete and accurate information and/or failed to correct overvalued, incomplete and false information regarding Veltex, which they knew was being disseminated to the general investing public by the Managing Defendants, and being relied on by members of the general investing public to purchase stock in Veltex at artificially inflated prices. The Accountant Defendants breached the duty of undivided loyalty and the duty of care they owed to Veltex.

119. As a result of the wrongful conduct of Defendants Moore, Moore & Associates, Chisholm, Haynes and Tahim, and the breaches of their duties owing to Veltex, Plaintiff Veltex has suffered a diminution in the value of its stock and going concern value in an amount in excess of thirty-five million dollars ($35,000,000) to be proven at trial.

120. The acts and conduct of the Accountant Defendants as alleged herein, constitute despicable and malicious conduct, with the intention of damaging Veltex, and for their own personal gain and benefit. Defendants Moore, Moore & Associates, Chisholm, Haynes and Tahim have acted with oppression, fraud and malice, entitling Veltex to exemplary and punitive damages, in an amount sufficient to punish and make an example of them, in an amount to be determined by the jury at the time of trial.

- 47 -

## SEVENTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty – Accountants

### (Against Defendants Moore, Moore & Associates, CBNM,

### Haynes and Tahim)

121.  Plaintiff repeats and realleges all of the allegations in paragraphs 1-65, as though fully set forth herein.

122.  By virtue of their relationship, activities, and actions as Plaintiffs' auditors and accountants, Defendants Moore, Moore & Associates, CBNM, Haynes and Tahim, set out to create and did in fact create a special relationship of trust and confidence, and thereby owed Plaintiff Veltex a fiduciary duty.  Plaintiff placed trust undivided loyalty and confidence in the fidelity and integrity of said Defendants in entrusting them with the auditing and accounting functions for Veltex, a company whose stock is publicly traded.  Defendants Moore, Moore & Associates, CBNM, Haynes and Tahim set out to induce and did induce Plaintiff to rely upon on their advice and guidance with respect to certain financial transactions; the proper accounting and auditing of Veltex' books and records; and in the preparation of financial statements.  A confidential and fiduciary relationship existed at all times and the Accountant Defendants were required to exercise independent judgment and use their utmost ability to act in a fair, just and equitable manner and in furtherance of the best interests of Veltex so as to benefit Veltex, and not to further their personal interests or their affiliates, or to further the interests of individual Officers and Directors of Veltex.

123.  By virtue of the structure and management of Veltex, their knowledge concerning the financial condition of Veltex, and their role as independent auditors/CPAs of Veltex, and their direct participation in the dissemination of information, said Defendants acted with an awareness of their primary wrongdoing and realized that their conduct would substantially assist the other Defendants, including Matin, Haque and Campbell, in the perpetration of the pump and dump

- 48 -

1  scheme, and in their wrongful conduct, wrongful goals, and wrongdoing.

2      124.  As a result of the actions, errors and omissions, set forth above,

3  Defendants Moore, Moore & Associates, CBNM, Haynes and Tahim have

4  breached the fiduciary duties owing to Plaintiff Veltex.

5      125.  As a direct and proximate result of such fiduciary breaches, and by

6  reason of these respective breaches by Defendants Moore, Moore & Associates,

7  CBNM, Haynes and Tahim of their duties owing to Veltex, Plaintiff Veltex has

8  suffered a diminution in the value of its stock and going concern value in an

9  amount in excess of thirty-five million dollars ($35,000,000) to be proven at trial.

10     126.  The acts and conduct of said Defendants as alleged herein, constitute

11  despicable and malicious conduct, with the intention of damaging Veltex, and for

12  their own personal gain and benefit.  Defendants Moore, Moore & Associates,

13  CBNM, Haynes and Tahim have acted with oppression, fraud and malice, entitling

14  Veltex to exemplary and punitive damages, in an amount sufficient to punish and

15  make an example of them, in an amount to be determined by the jury at the time of

16  trial.

17  ## PRAYER FOR RELIEF

18     WHEREFORE, Plaintiff prays for judgment against Defendants, as follows:

19  ### On the First Claim for Relief

20     1.  For general damages according to proof at the time of trial in an amount

21  in excess of $35,000,000; and

22     2.  For punitive and exemplary damages in an amount deemed by the trier of

23  fact to be sufficient to punish, deter and make an example of Defendants.

24  ### On the Second Claim for Relief

25     1.  For an Order requiring restoration of the fraudulently transferred Veltex

26  assets;

27     2.  For general damages according to proof at the time of trial in an amount

28  in excess of $35,000,000; and

- 49 -

BLECHER & COLLINS
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW

3. For punitive and exemplary damages in an amount deemed by the trier of fact to be sufficient to punish, deter and make an example of Defendants.

### On the Third Claim for Relief

1. For general damages according to proof at the time of trial in an amount in excess of $35,000,000; and

2. For punitive and exemplary damages in an amount deemed by the trier of fact to be sufficient to punish, deter and make an example of Defendants.

### On the Fourth Claim for Relief

1. For general damages according to proof at the time of trial in an amount in excess of $35,000,000; and

2. For punitive and exemplary damages in an amount deemed by the trier of fact to be sufficient to punish, deter and make an example of Defendants.

### On the Fifth Claim for Relief

1. For general damages according to proof at the time of trial in an amount in excess of $35,000,000; and

2. For punitive and exemplary damages in an amount deemed by the trier of fact to be sufficient to punish, deter and make an example of Defendants.

### On the Sixth Claim for Relief

1. For general damages according to proof at the time of trial in an amount in excess of $35,000,000; and

2. For punitive and exemplary damages in an amount deemed by the trier of fact to be sufficient to punish, deter and make an example of Defendants.

### On the Seventh Claim for Relief

1. For general damages according to proof at the time of trial in an amount in excess of $35,000,000; and

2. For punitive and exemplary damages in an amount deemed by the trier of fact to be sufficient to punish, deter and make an example of Defendants.

First Amended Complaint

## On All Claims for Relief

1. For attorneys' fees, expenses and costs of suit incurred by Plaintiff in prosecuting this action;

2. For such other and further relief as the Court may deem just and proper.

Dated:     July 16, 2010

BLECHER & COLLINS, P.C.
MAXWELL M. BLECHER
MARYANN R. MARZANO
KRISTEN M. PETERS


By: _____
    KRISTEN M. PETERS
    Attorneys for Plaintiff
    VELTEX CORPORATION

- 51 -

First Amended Complaint

## DEMAND FOR JURY TRIAL

Pursuant to the Federal Rules of Civil Procedure, Rule 38(b), Plaintiff VELTEX CORPORATION hereby demands a jury trial on all issues so triable.

Dated:    July 16, 2010

BLECHER & COLLINS, P.C.
MAXWELL M. BLECHER
MARYANN R. MARZANO
KRISTEN M. PETERS

By:    _K. Peters_____
KRISTEN M. PETERS
Attorneys for Plaintiff
VELTEX CORPORATION

41462.1

- 52 -